UNITED STATES DISTRICT COURT          <u>FOR ONLINE PUBLICATION ONLY</u>
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
                                        :
JENNIFER PLUCK,                         :
                                        :
                    Plaintiff,          :        MEMORANDUM
                                        :        <u>AND ORDER</u>
         -against-                      :        10-CV-02042 (JG)
                                        :
MICHAEL J. ASTRUE,                      :
Commissioner of Social Security,        :
                                        :
                    Defendant           :
                                        :
-------------------------------------------------------x

A P P E A R A N C E S

        HERBERT S. FORSMITH
                26 Broadway, 17th Floor
                New York, New York 10044
                *Attorney for Plaintiff*

        LORETTA E. LYNCH
                United States Attorney
                Eastern District of New York
                271 Cadman Plaza East
                Brooklyn, New York 11201
        By:     Arthur Swerdloff
                *Attorney for Defendant*

JOHN GLEESON, United States District Judge:

        Jennifer Pluck seeks review, pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), of

the Social Security Commissioner's determination that she is not entitled to disability insurance

benefits under Title II of the Social Security Act. The Commissioner moves for judgment on the

pleadings, pursuant to Fed. R. Civ. P. 12(c), asking the Court to affirm his decision respecting

Pluck's alleged disability. Pluck cross-moves for judgment on the pleadings, seeking an order

remanding the case solely for the award of disability benefits from March 20, 1998. For the

reasons stated below, the Commissioner's motion is denied and Pluck's motion is granted, but

only to the extent that the case is remanded to the Commission for further proceedings consistent with this decision.

BACKGROUND

A.     *Procedural History*

Pluck applied for disability benefits under Title II of the Social Security Act on March 4, 2002, claiming disability as of March 20, 1998.  R. 123-25.  She claimed that she became unable to work as of that date because of pain in her back, neck, hip, and shoulders, and swelling of her right hand resulting from an accident at work that occurred on March 20, 1998 and an automobile accident that occurred on February 5, 2002.  R. 147, 160, 282.  On March 22, 2005, more than three years after Pluck made her application, a hearing was held before Administrative Law Judge ("ALJ") Martin Kahn.  R. 779-811.  Pluck, who was represented by counsel throughout the administrative proceedings, testified at the March 22 hearing.  *Id*.  ALJ Kahn retired prior to deciding Pluck's application.  A second hearing was held before ALJ Hazel C. Strauss on October 27, 2005.  R. 673-731.  Pluck again testified.  *Id*.  On November 22, 2005, ALJ Strauss found that Pluck was not disabled within the meaning of the Social Security Act because she retained the residual functional capacity ("RFC") to perform a reduced range of light work, which left her unable to perform her past relevant work as a nurses' aide but able to perform jobs existing in significant numbers in the national economy in light of her age, education, and work experience.  R. 29E-M.

After a fifteen month gap, on February 21, 2007, the Appeals Council vacated ALJ Strauss's decision and remanded the case for further administrative proceedings.  R. 73-76. The Appeals Council specified two issues to be addressed on remand.  First, in determining Pluck's RFC, ALJ Strauss relied at least in part on the findings and opinions of Dr. Mohammad

Khattak, a consultative examiner.  Subsequent to ALJ Strauss's decision, but prior to the Appeals Council's vacatur, Khattak was removed from the New York State Agency panel of physicians eligible to perform consultative examinations in Social Security cases.  The ALJ was thus instructed on remand to disregard all evidence from Khattak and supplement the record accordingly.  R. 75.  Second, the ALJ was directed to recalculate Pluck's date last insured in light of previously unaccounted-for work activity in 2003 and 2004.  *Id.*

On remand, additional hearings were held on July 24 and October 21, 2008.  R. 723-78, 640-72.  Pluck testified at the July hearing and was present, with her attorney, at the October hearing.[1]  *Id.*  On December 2, 2008, twenty months after remand, ALJ Strauss again concluded that Pluck was not disabled, finding that she retained the RFC to perform medium work and was therefore capable of performing her past relevant work as a nurses' aide as well as other jobs existing in significant numbers in the national economy.  R. 20-29.  More than one year later, the Appeals Council denied Pluck's request for review on January 8, 2010, R. 7-9, rendering the ALJ's December 2, 2008 decision the final decision of the Commissioner, *see DeChirico v. Callahan*, 134 F.3d 1177, 1179 (2d Cir. 1998).  On April 16, 2010, the Appeals Council granted Pluck an extension of time to seek district court review of the Commissioner's decision.  R. 6.  Pluck filed the instant action on May 4, 2010, and the parties subsequently filed cross-motions for judgment on the pleadings.  Oral argument of the motions was heard on January 28, 2011.  Pluck is represented in these proceedings by new counsel.

B.    *Pluck's Age, Education, Family and Work History*

Jennifer Pluck was born on June 2, 1962 in Guyana and moved to the United States in 1985.  R. 123, 782.  She completed high school and one year of college in Guyana.  R.

---

[1]    The October hearing was required because Dr. Arthur Brovender, the medical expert who was scheduled to give an opinion as to Pluck's medical condition, had not received all of Pluck's records prior to the July hearing.  R. 642, 774-77.

782.  She has reported having received a General Equivalency Diploma.  R. 153.  As of March

2005, Pluck was divorced with five children between the ages of fifteen and twenty-five.  R. 792.

The two youngest children, ages fifteen and sixteen, lived with her, and the other three lived in

Guyana.  *Id*.  Her sole source of income was child support payments.  R. 793.  She had

previously received worker's compensation benefits, but only from 1998, following a fall at

work, until 2002, when she was paid a lump-sum settlement in place of continuing benefits.  R.

687-89, 793.

From 1992 until March 20, 1998, the alleged onset date of her disability, Pluck

worked as a nurses' aide in a nursing home, which she described as heavy work that involved

lifting patients in her arms in order to bathe them or to move them from their beds to their

wheelchairs.  R. 147-48, 721.  From August 2003 until April 2004, several years after she had

filed for disability benefits, Pluck again worked as a nurses' aide.  R. 162, 678.  In her new

capacity, Pluck's duties involved "absolutely no lifting."  R. 681.  Instead she performed what

she described as light work, such as monitoring patients on breathing apparatuses, escorting

patients throughout the hospital, supervising patients who could bathe themselves, and assisting

in dressing and grooming patients.  R. 162, 678, 721.  Nonetheless, Pluck testified that she had to

stop working in April 2004 because the work was still too strenuous.  R. 684.

From August 2004 until October 2004, Pluck worked as a home health aide or

companion to individual patients who were able to walk, escorting them to their doctors'

appointments, helping them to dress and groom themselves, and serving (and sometimes

preparing) their meals.  R. 162, 681-82.  Pluck testified that she was not required to lift or carry

anything as part of her job as a home health aide and that she spent sixty percent of her time

lying down, although she was not supposed to.  R. 682-83.  Pluck testified that she lost her job as

a home health aide due to her disabilities.  R. 683.  At the end of the October 21, 2008 hearing, when asked by ALJ Strauss whether she was working at that time, Pluck indicated that she was performing temporary work.  R. 671.

C.    *Pluck's Description of Her Medical Condition*

On her application for benefits, Pluck claimed she was limited in her ability to work because of pain in her back, neck, hip, and shoulders, and swelling of her right hand, which rendered her unable to sit or stand for extended periods of time, to bend, or to lift weights, and which required her to take pain medications that made her drowsy.  R. 147.  She also reported on her application having suffered from shortness of breath, an elevated heart rate and dizziness, as well as pain in her ankles, head, hands, and jaw, but she did not identify these ailments as limitations on her ability to work.  R. at 148-49.  At the March 22, 2005 hearing, Pluck testified that she was 5'3" tall and weighed 181 pounds, but had been much heavier – at one point weighing as much as 242 pounds – before having gastric bypass surgery.  R. 658, 796, 806.

Pluck testified that she originally stopped working on March 20, 1998, following a slip-and-fall accident.  R. 784.  She spent one night in the hospital after the accident and subsequently suffered from headaches and constant pain in her neck, her upper and lower back, her right wrist, her knees, her shoulders, and her hips.  R. 784, 786-87, 802-03.  Pluck claimed that she had been unable to walk or use her right leg for about six months following the fall, and she could not drive for a period of time because she had trouble controlling her hands.  R. 686-87, 690.  She was treated for injuries sustained in the accident with physical therapy and prescription painkillers and anti-inflammatory medications, which eased her pain.  R. 785-86.  Pluck did not have surgery at this or any other time to treat her injuries.  R. 693.  In February of 2002, Pluck was involved in a car accident in which she hit her head, injured her right shoulder

and otherwise exacerbated the injuries she had sustained in her 1998 fall. R. 691, 802-03. A law suit ensued and was resolved by a settlement in 2004, pursuant to which Pluck received either $19,000 or $28,000. R. 691, 803-04.

In 2003, despite her injuries, Pluck returned to work, first as a nurses' aide in a nursing home and then as a home attendant, a position that gave her more of an opportunity to lie down if she needed to. R. 787-88, 681. Pluck was not expected to work every day and was instead called on an as-needed basis. R. 788. Even so, Pluck testified that sometimes she was unable to work on the days she was called because her pain prevented her from getting up. *Id.* On other days, she reported to work but had trouble fulfilling her responsibilities, including those that required her to bend, and she spent what she approximated to be sixty percent of her time lying down, even though she was not supposed to. R. 789, 682-83. She had to lie down that often because her pain made it hard for her to function and her medication – Hydrocodeine and a muscle relaxant – made her drowsy. R. 683, 690. On some days when she went to work, she had to leave early and return home. R. 788-89. Even so, Pluck testified that she sometimes worked eight – or even twelve – hour days. R. 697.

Pluck testified that she left her nursing home job in April 2004 because she could not function due to her pain and the side effects of her medicine. R. 684. She explained that she "was trying to . . . just support [her] family somehow, but then I find that I can't do what I started . . . ." Four months later, in August 2004, she took a new, less strenuous job as a companion, but in October 2004, she lost that job as well because she was found sleeping while on duty; she claimed she had fallen asleep under the influence of her medication. R. 683. At the July 24, 2008 hearing, Pluck described the incident that led to her termination. R. 749-50. She was preparing food for the patient she was attending and while it was cooking, she became drowsy

and lay down.  R. 749.  The food began to burn, and the house filled with smoke, but Pluck was

asleep and unaware of the problem.  R. 749-50.  When the smoke alarm went off, the patient

turned off the stove, woke Pluck with some difficulty, and helped her out of the house.  R. 750.

At the 2005 hearings, Pluck reported that since her slip-and-fall accident at work

in 1998, she had been unable to sit for more than an hour or stand for more than a half-hour due

to back pain, and that she could not walk more than a block or a block and a half without her

right leg and foot becoming numb.  R. 692, 789-90.  If she tried to sit for too long, she

experienced severe pain in her hips; if she tried to stand or walk for too long, her back would

hurt and her right leg would get heavy.  R. 692-93.  Pluck indicated that her condition and degree

of suffering had not changed between 1998 and 2005.  *See* R. 692-93.  She said in March 2005

she was making approximately monthly visits to a clinic at Queens Hospital Center in order to

have her prescription for the painkiller Hydrocodone renewed.  R. 796-98.  Although she had

been prescribed Vicodin in the past, Hydrocodone was the only medication she was taking at the

time of the March 22, 2005 hearing.[2]  R. 798.  She was taking it as needed.  *Id.*  Pluck was still

taking Hydrocodone at the time of the October 27, 2005 hearing; she reported that she had been

taking it "off and on" since 1998.  R. 690.  She had also been receiving physical therapy off and

on since 1998.

At the March 22, 2005 hearing, Pluck said that she tried to "function like a person

should" and complete household chores, but she spent most of her time – an average of eight

hours each day between 7:00 a.m. and 7:00 p.m. – lying down, easing her "excruciating" pain by

---

[2]        An exchange at the start of the March 22, 2005 hearing suggested that Pluck might have been
suffering mental side effects from her medication.  After Pluck answered a handful of questions posed by her
attorney and said she had stopped working in 1988 instead of 1998, ALJ Kahn told her she could take a break if she
felt nervous.  R. 783.  She responded that she was not nervous, but had taken a painkiller before the hearing, which
was affecting her.  *Id.*

walking around a little or sitting still, taking medicine, or placing on her back a vibrating device given to her by her doctor.  R. 790-91.  Pluck occasionally prepared sandwiches for the two children who lived with her, but otherwise they prepared meals for her.  R. 794.  Fellow members of her church helped her to maintain her home.  *Id*.  Pluck attended church weekly.  R. 795-96.  On October 27, 2005, Pluck testified that she drove her car regularly – at least once or twice a week – and sometimes drove her children to school every day when the weather was bad.  R. 693.

D.  *The Medical Evidence*

1.  *1998-2001: From the Alleged Onset Date Until the Automobile Accident*

After she fell on March 20, 1998, Pluck was taken to Brunswick Hospital, where she had x-rays taken before being discharged.  R. 282.  Pluck visited Dr. Ajendra Sohal, who would become a treating physician, once in March and twice in April 1998 for follow-up examinations. R. 282-83, 318-21. 278-89.  She complained of headaches, severe cervical pain, pain and swelling of her right wrist, neck pain radiating to the  right upper extremity, lower back pain, right gluteal pain, right hip area pain and discomfort as well as an inability to stand from a supine position.  *Id*.  Sohal found reduced range of motion in her leg, back and shoulder and reduced deep tendon reflexes in her knee, biceps, triceps and brachioradialis region.  R. 282, 320.  On March 23, Sohal, who was unable to complete a full exam due to Pluck's pain and spasms, R. 282, diagnosed cervical, lumbar and wrist contusion and sprain and strain, and possible radiculopathy and carpal tunnel syndrome, and he prescribed physical therapy, rest, a cervical collar, and Vicoprofen, a narcotic pain reliever and anti-inflammatory.  R 321.  He deemed her temporarily totally disabled, recommending re-evaluation every two weeks.  *Id*.

On April 3, Dr. Sohal's impression was severe cervical and lumbar sprain and strain, right hand injury with possibility of fracture, possible cervical radiculopathy, gluteal sprain and strain, hip contusion, and post-concussion syndrome. R. 283. He prescribed continued physical therapy, the narcotic pain reliever Vicodin and the non-steroidal, anti-inflammatory Anaprox. *Id*. Sohal again deemed Pluck temporarily totally disabled and called for further evaluation every two weeks. R. 283. X-rays taken of Pluck's right hip and pelvis on April 4, 1998 indicated mild degenerative arthritis but no fracture or dislocation and no lytic or sclerotic lesions or abnormal soft tissue calcifications. R. 308. X-rays of her right hand and wrist also revealed no fracture or dislocation, but minimal degenerative arthritis of one joint. *Id*. At the April 22, 1998 exam, Sohal diagnosed status-post work-related injury, cervical strain and sprain, possible cervical radiculopathy, cervical myofasciitis, right shoulder derangement with probable rotator cuff tendonitis, right wrist sprain and strain, and lumbar sprain and strain. R. 278. Sohal prescribed Vicoprofen and Flexeril, a muscle relaxant. *Id*. He also suggested trigger point injections for the right shoulder and scapular region, but Pluck refused. *Id*. Sohal recommended Pluck continue physical therapy for her back, shoulders and right wrist, and that she see an orthopedist for her right shoulder. R. 278-79. This time, Sohal found Pluck "partially totally disabled." R. 279.

In addition to the x-rays taken on April 4, 1998, Pluck had a CT scan of her cervical spine on May 5, 1998, an MRI of her cervical spine on June 25, 1998, and an MRI of her right shoulder on July 2, 1998. R. 309-11. The May CT scan revealed straightened lordosis, suggesting muscular spasm, and rotator scoliosis; bulging discs at C2-C4; a bulging disk at C4-C5, accompanied by posterior bony ridges; stenosis of the neural foramina of all levels from C2-T1 and an enlarged thyroid gland. R. 310. The June MRI showed posterior disc bulges at C4-5

and C5-6 with muscle spasm.  R. 311.  The July MRI of the right shoulder revealed supraspinatus tendinitis and supraspinatus muscle impingement related to spur formation in the acromioclavicular joint.  R. 309.

Pluck continued to visit Dr. Sohal throughout the summer of 1998; he conducted four examinations between June 10, 1998 and September 25, 1998.  R. 280-81, 284-87, 322.  He repeatedly diagnosed status-post work related injury, possible cervical radiculopathy, cervical strain and sprain, right shoulder derangement and impingement, and right wrist injury.  R. 280, 284, 286.  Sohal continued to opine that Pluck was temporarily disabled, and he continued to prescribe pain medications and to recommend physical therapy.  R. 280-81, 284-86.  Though he noted on July 6, 1998 that her lumbar sprain and strain were resolving, R. 284, Sohal believed throughout 1998 that Pluck was totally disabled.  On April 13, 1998, after Pluck's first two visits to Sohal, and again on April 29, 1998, after her third visit, Sohal wrote letters in which he stated that Pluck was unable to function in a home or work environment due to severe pain and drowsiness induced by her pain medication.  R. 276-77.  On November 25, 1998, Sohal again wrote a letter stating that Pluck was totally disabled and unable to work due to the injuries sustained to her neck, lower back, and right shoulder, and due to drowsiness.  R. 275.

In June 1998, Dr. Sohal referred Pluck to a hand surgeon, Dr. Rogers, for consultation on her right wrist.  R. 280.  Rogers advised x-rays, but those were never done because of transportation problems; he also prescribed a splint, but Pluck did not purchase one due to financial problems.  R. 199.  On July 17, 1998, Pluck an consulted orthopedist, Dr. Donald Forman, complaining of constant pain and spasms in her neck and back, constant pain in her right hand and right leg, difficulty walking for a prolonged period of time, difficulty sleeping, blurred vision, and depression.  *Id*.  After a physical examination and a review of Pluck's

records, Forman concluded that Pluck suffered from residual sprain of the cervical spine, of both shoulder girdles, and of the lumbosacral spine. R. 201. He recommended continued physiotherapy and further observation by her physician for eight weeks. *Id.* According to Forman, Pluck was experiencing "a moderate degree of disability," and he anticipated that she could return to work as a nurses' aide in six to eight weeks from the date of the examination, although she might need to avoid heavy lifting and repeated bending for several weeks after that. *Id.*

Pluck visited Dr. Sohal regularly throughout the following year, paying him nine visits between March 17 and October 25, 1999. R. 288-97, 323. At the first consultation on March 17, Sohal observed that Pluck had gained 40 to 50 pounds in the past year. R. 288. He also found it "difficult to assess patient's return to work" at that time. *Id.* In March and April of 1999, Sohal's impression remained chronic right shoulder derangement, adhesive capsulitis, cervical derangement, cervical radiculopathy, and right hand injury. R. 288, 290, 293. On April 26, 1999, Sohal diagnosed carpal tunnel syndrome in Pluck's right hand, and noted that her condition had worsened. R. 293. He also observed that her pain medication made her drowsy and unable to function. *Id.* Nonetheless, throughout 1999, Sohal continued to prescribe narcotic pain medication, specifically Vicodin. R. 288-97, 323. Despite the drowsiness Pluck complained of, on June 24, 1999, Sohal noted that he had not observed any side effects or abuse. R. 294. He also consistently advised Pluck to attend physical therapy and to move her right shoulder in order to increase its range of motion. R. 288-90, 293-97, 323. In April 1999, he recommended arthroscopic decompression surgery to increase her range of motion and reduce her pain, and he referred Pluck back to the hand surgeon Rogers, but he noted in July 1999 that she had refused to follow-up with either the hand surgeon or an orthopedic surgeon. R. 288,

295-95A.  He also noted in September 1999 that Pluck had been noncompliant with physical therapy and was refusing the injection therapy he had recommended.  R. 296.

Dr. Sohal's notes prior to April 26, 1999 contain reports of the physical examinations he conducted and his impressions, as well as a brief medical history and a list of recommendations and prescriptions.  R. 293.  However, Sohal's notes from Pluck's visits on June 24, July 12, July 28, September 13, and September 27, 1999 include only the medical history and recommendations; he did not provide any diagnoses in 1999 after the April 6 consultation.  R. 294-97

Meanwhile, on June 28, 1999, Pluck reported to the Queens Hospital Center emergency department complaining of intermittent chest pain, shortness of breath, and heart palpitations.  R. 349.  An electrocardiogram ("EKG") revealed no abnormalities.  R. 350.  Pluck was examined, diagnosed with musculoskeletal pain, and discharged with the advice that she take Advil or Tylenol and that she take a brisk thirty-minute walk each day.  *Id.*

After a gap of seven months, Pluck returned to Dr. Sohal in the summer of 2000, visiting him once each in May, June, August, and September.  R. 298-301.  His observations were consistent with those he made during her most recent previous visits: Pluck complained of pain in her neck, back, right shoulder, and right wrist; Sohal observed limited range of motion in her back and right shoulder and weakness on her right side; and he continued to prescribe narcotic pain relievers, first Percocet and then Vicodin.  *Id.*  On September 23, 2000, two days before one of her visits to Sohal, Pluck returned to the Queens Hospital Center emergency department with complaints of wheezing, productive cough, and shortness of breath.  R. 351-52.  She was diagnosed with asthmatic bronchitis and provided with prescriptions for Bactrim, an antibiotic, and Proventil and Aerobid, both used to treat asthma.  *Id.*  On October 5, 2000, Pluck

was seen at the primary care clinic of Queens Hospital Center for a physical examination. R. 325-26. She was diagnosed with asthma and obesity. *Id.* Three months later, on January 4, 2001, she received counseling at the Queens Hospital Center nutrition clinic, where her weight was recorded at 273 pounds. R. 334.

In 2001, Pluck continued to visit Dr. Sohal sporadically. She saw him twice in February, and once each in April, July, October, and December. R. 302-307. As in previous years, Sohal observed that as the result of her work-related injury, Pluck was suffering from right shoulder tendonitis and capulitis, right-sided cervical radiculopathy, and lumbar sprain and strain and myofascial pain. R. 302. He also diagnosed her with right carpal tunnel syndrome. R. 302. The prescriptions for narcotic pain medication continued throughout 2001, despite a recorded warning on February 26, 2001 that she might lose her prescriptions. R. 302-03. On April 12, 2001, Pluck complained that Vicodin was not helping her pain, and her prescription was changed to Percocet. R. 304. On July 25, Sohal wrote that Pluck was denying side effects from and abuse of the pain medication. R. 305. On October 24, 2001, the prescription was changed back to Vicodin, and Pluck continued to deny side effects. R. 306. Sohal reported on December 3, 2001 that Pluck was "tolerating medication well." R. 307. On July 25, Sohal wrote that Pluck was participating in physical therapy intermittently with some relief for her symptoms, but otherwise, throughout 2001, Sohal reported that Pluck was refusing any intervention for pain management other than medication and was not compliant with physical therapy. R. 302-07. At the February and April visits, Sohal observed that Pluck was temporarily totally disabled; there is no comment in his notes from the other 2001 exams about Pluck's ability to work. R. 302-304.

From July through September of 2001, Pluck was seen at the medical clinic at the Queens Hospital Medical Center in an effort to obtain clearance for gastric bypass surgery. R.

335-3401.  On July 26, her asthma was found under control, her extremities were found to have a full range of motion, and she reported no complaints; on August 16, she received diagnoses of hyperlipidemia, anemia, stable asthma, and obesity; and on September 7, when screened for pain, she complained of a three-and-a-half year history of neck and shoulder pain, which she rated at a severity of seven out of ten and described as burning and/or throbbing.  R. 337-38.  Pluck did not receive the gastric bypass surgery until March 6, 2002.  *See* R. 224.

    2.    *2002-2005: From the Automobile Accident Until the Date Last Insured*

    Following a car accident on February 5, 2002, Pluck was taken to the Mary Immaculate Hospital emergency room with neck and back pain.  R. 204-06.  She was diagnosed with cervicalgia,[3] lumbago,[4] pain in a limb, and pain in a joint involving her ankle and foot, and was discharged.  R. 205; Def. Mem. 13, Oct. 7, 2010, ECF No. 17.  On March 22, 2002, Pluck saw Dr. Enrico Fazzini of Five Towns Total Medical Care ("Five Towns") for a neurology consultation in light of the accident.  R. 224-25.  According to Fazzini, Pluck sustained a head injury in the accident, as well as injuries to her left shoulder, left knee and left ankle.  R. 224.  She complained of headaches; dizziness; ringing in her ears; neck pain with numbness; tingling and weakness in the shoulders, arms and hands; low back pain with numbness, tingling, and weakness in her buttocks, hips, thighs, legs, and feet; left shoulder pain; left knee pain and stiffness with difficulty walking, standing, and climbing stairs; pain and swelling in her jaw from a tooth broken in the accident; and pain in her ankles.  *Id*.

---

[3]    Cervicalgia is intermittent neck and shoulder pain.  Dr. Sandeep S. Rana, Cervical Spondylosis, Diagnosis and Management, *emedicine from WebMD* (2010), http://emedicine.medscape.com/article/1144952-overview.

[4]    Lumbago is "acute or chronic pain (as that caused by muscle strain) in the lower back." MedlinePlus Merriam-Webster Medical Dictionary, *lumbago*, http://www.merriam-webster.com/medlineplus/lumbago.

Following a physical examination, Dr. Fazzini found Pluck to be "in moderate distress" because of her symptoms. R. 225. He also found significant tenderness and spasm in the cervical, dorsal and lumbar spines, bilaterally; significant weakness in the left deltoid and bilateral soleus; absent deep tendon reflexes bilaterally, decreased sensation to pinprick; a slow gait; and significantly decreased ranges of motion and function in her back, as well as decreased ranges of motion and function in her left leg. R. 224A-25A. He concluded that Pluck was "partially disabled at present." R. 225A. Although the precise ranges of motion varied, Fazzini made similar findings at examinations that took place on April 5 and April 26, 2002, and again approximately once a month between July 2002 and April 2003 and on May 21 and August 13, 2004.[5] R. 228-63. He also consistently prescribed Vicodin. *Id.* Each time he saw her, Fazzini determined that Pluck was partially disabled. R. 228. An instruction given by Fazzini on March 22, 2002 that Pluck refrain from any physical activity including lifting, bending and twisting, R. 225, was not repeated, and on November 22, 2002, Fazzini directed Pluck to lift, bend and twist "with caution," R. 248.

MRIs taken of Pluck's spine on March 29 and April 12, 2002 showed diffuse straightening of the spine, disc bulges effacing the thecal sac and impinging the epidural fat. R. 271-72. An April 12, 2002 MRI of her left knee revealed a first-grade signal change in the posterior horn of the medical meniscus, a knee joint effusion with a Baker's cyst and a cystic lesion in the proximal tibia. R. 274.

On July 2, 2002, Pluck saw orthopedist Dr. Robert Copulsky complaining of generalized discomfort following the February 5, 2002 car accident, and particular discomfort in

---

[5] Pluck's regular visits to Fazzini ended a few months before she resumed working as a nurses' aide in August 2003. The May and August 2004 visits to Fazzini both took place after Pluck left her job as a nurses' aide in the nursing home in April 2004 and before she resumed – or just as she was resuming – work as a companion in August 2004.

her neck, lower back, and left knee.  R. 553-54.  Copulsky observed that Pluck had full ranges of motion in her shoulders, elbows and wrists, although she experienced some discomfort with shoulder motion and had mildly restricted motion in her spine and left knee.  R. 553.  He found some straightening of the normal lordotic curvature indicative of muscle spasm, and an MRI indicated several bulging discs and discogenic disease, but no herniated discs.  *Id*.  An MRI of the left knee indicated a possible meniscal pathology of the posterior horn of the medial meniscus, but showed no definite tears.  R. 554-55.  A cystic lesion was revealed in the proximal tibia, but it appeared benign.  R. 554.  Copulsky diagnosed Pluck with cervical and lumbosacral sprains and a sprain of the left knee and recommended continued physical therapy and reevaluation if symptoms persisted.  *Id*.

On August 1, 2002, Pluck returned to the Queens Hospital Center medical clinic and was examined in connection with her obesity following her gastric bypass surgery; asthma, which was found asymptomatic; anemia; and hyperlipidemia.  R. 342-45.  Pluck had no complaints, but when asked about any pain she was experiencing, she reported having had on-and-off cramps since that morning with a pain level of eight to ten out of ten.  R. 342-43.  She was again seen for her asthma on September 3, 2002 at the Queens Hospital Center emergency department, R. 357-58, where she returned on October 1, 2002, complaining of right ear and a right-sided headache that had persisted for three weeks.  R. 359-60.  The impression was possible right ear tinnitus, and Pluck was referred to an ear, nose and throat specialist.  *Id*.  Pluck again reported to the Queens Hospital medical clinic complaining of abdominal pain on February 32, 2004 and it was noted that she was status-post gastric bypass surgery.  R. 348.

An MRI of Pluck's right shoulder on November 1, 2002 revealed acromioclavicular hypertrophy[6] with supraspinatus tendinopathy and a partial tear, a small amount of subcoracoid fluid, anterior inferior labral hypertrophy, and subscapularis tendinopathy.  R. 273.

Meanwhile, from March 22, 2002 through May 2, 2003, Pluck underwent chiropractic treatment, acupuncture and physical therapy at Five Towns, where she reported every few days, with occasional gaps of several weeks.[7]  R. 555-82.[8]  Her most common complaints were stiffness and pain in her neck and back, but she repeatedly said that the pain and stiffness were getting better.  *Id.*

On February 28, 2005, approximately six months after her last visit to Dr. Fazzini, Pluck was again seen at Queens Hospital Center with complaints of neck pain, cervical disc disease and right shoulder pain with difficulty of abduction of five to six years' duration, tinnitus of one year's duration, asthma with no recent exacerbations, and dyspepsia which was being successfully treated.  R. 513.  A musculoskeletal examination revealed no localized tenderness of the shoulder and full range of motion; her neck was found to be supple.  *Id.*

On March 19, 2005, Pluck presented to the Queens Hospital Center neurology clinic because of neck pain that was radiating down her right shoulder, which she described as constant and burning and rated at nine out of ten in terms of severity.  R. 365-66.  She reported

---

[6]     Acromioclavicular hypertrophy is a thickening of the joint located at the top of the shoulder.  *See* MedlinePlus Merriam-Webster Medical Dictionary, *hypertrophy*, http://www.merriam-webster.com/medlineplus/hypertrophy (defining hypertrophy as "excessive development of an organ or part; *specifically* : increase in bulk (as by thickening of muscle fibers) without multiplication of parts"); MedlinePlus Merriam-Webster Medical Dictionary, *acromioclavicular*, http://www.merriam-webster.com/medlineplus/acromioclavicular (defining acromioclavicular as "relating to, being, or affecting the joint connecting the acromion and the clavical).

[7]     As with her regular visits to Dr. Fazzini, Pluck's attendance at physical therapy dropped off shortly before she resumed work at a nursing home in 2003.

[8]     The record contains the results of a consultative orthopedic examination conducted by Dr. Khattak on April 17, 2002.  R. 207-08.  Because Khattak was subsequently decertified as a consultative examiner, the Appeals Council instructed ALJ Strauss to disregard his evidence, and the ALJ accordingly did not consider his report.  R. 27.  I do not discuss that evidence here.

that she had felt constant pain, as well as weakness in her right hand, since her 1998 fall, but that the pain had been getting worse. R. 365. She also said she was able to perform daily functions. *Id*. Upon examination, Pluck was found to have full muscle strength and elbow flexion extension but reduced right hand grip (four out of five), reduced strength in her right knee (four out of five), and reduced right shoulder motion due to pain. R. 365-66.

Pluck returned to Queens Hospital Center five months later on June 9, 2005, requesting an out of network referral for revision of her gastric bypass, R. 512, and again on August 15, 2005, R. 367-68. On the latter date, Pluck was seen by Dr. Xiao Liang Zhang at the Department of Rehabilitation Medicine for right shoulder capsulitis and low back pain, and was prescribed physical therapy and a home exercise program. R. 368.

The final medical exam reflected in the record that took place prior to the last date insured occurred on November 29, 2005 at the Queens Health Network at Queens Hospital Center. R. 511. Pluck was experiencing right upper quadrant abdominal pain and epigastric pain. R. *Id*. She was given a refill of ferrous sulfate for anemia iron deficiency. *Id*. An abdominal sonogram performed on December 5, 2005 showed no abnormalities. R. 479-80.[9]

3.       *2005-2008: From the Last Date Insured Until the Hearings Before ALJ Strauss*

Between the last date insured and at least May 2008, Pluck continued to visit the Queens Health Network regularly. R. 476-511. She was seen primarily for complaints unrelated to the conditions that form the basis of her claimed social security disability, including complaints related to her obesity, R. 486-89, 503-04, 506-10; asthma, R. 482-83; iron deficiency and anemia, R. 485, 491; conjunctivitis, R. 488; chest pain, R. 489-90; anxiety and depression,

---

[9]       At the March 22, 2005 hearing, Pluck testified that she was then seeing a Dr. Akala at a clinic at Queens Hospital Center, whom she visited about once a month to have her prescriptions renewed. 796-97. These visits do not appear to be documented in the record.

R. 489; and for a preoperative examination for "breast implants and removal of redundant skin," R. 495.

With respect to her musculoskeletal condition, Pluck made several complaints in 2006, 2007, and 2008 at the Queens Health Network of shoulder pain and multiple joint pain, which she sometimes described as persistent, and it was noted that she was being treated by the rehabilitation clinic where she was prescribed nonsteroidal anti-inflammatories. R. 485, 489, 495, 502. On March 4, 2008, her "multiple joint pain medical problems" were reported to be "under control." R. 492.

On November 7, 2007, Pluck saw orthopedist Dr. Surendranath K. Reddy after a car ran over her foot two days earlier, causing her to fall backwards and injure her lower back. R. 373. Reddy reported that "prior to this accident the patient was in good health." *Id*. After the accident, her symptoms included "moderately severe" low back pain radiating down the left leg and foot with tingling and weakness, left knee pain with limited range of motion, and left ankle pain. *Id*. Reddy found that a review of Pluck's medical history revealed no similar symptoms.[10] *Id*. A physical examination revealed spasms and tenderness in her lumbar spine, as well as reduced range of motion. R. 374. Pluck had significant weakness in her left quadriceps and tibialis anterior muscles and decreased range of motion in her left ankle and knee. *Id*. Reddy determined that Pluck was totally disabled for the time being, and his prognosis was "guarded." R. 375.

Dr. Reddy saw Pluck for follow-up examinations on December 8, 2007 and January 15, 2008 and found the range of motion in her lumbar spine somewhat improved, but otherwise his findings and diagnoses remained much the same. R. 379-382. She was still

---

[10] This finding was odd, as in fact, Pluck's medical record was replete with indications of similar pain and limitations.

deemed totally disabled.  *Id.*  Pluck also began physical therapy following the accident, on

November 8, 2007, and continued through June 30, 2008 with some gaps.  R. 402-34, 627-36.

In addition to the orthopedic consult, Pluck consulted neurologist Dr. Farshad

David Hannanian on November 15, 2007 because of the accident she had suffered earlier that

month.  R. 376-78.  Hannanian's conclusions were similar to those of Reddy; he found decreased

range of motion in Plcuk's lumbar spine, weakness on her left side, and restricted movement in

her left ankle and knee, and he determined Pluck to be totally disabled and limited in performing

daily functions.  R. 377-78.

MRIs and x-rays were taken of Pluck's lumbar spine and left knee in November

and December 2007.  X-rays of her lumbar spine made on November 29, 2007 were negative,

but an MRI on December 8, 2007 showed discal T2-weighted signal loss, disc bulging,

transitional vertebra at the lumbosacral junction, and multilevel osteoarthritic facet disease.  R.

370, 372.  An MRI of Pluck's left knee, also performed on December 8, 2007, revealed grade I

to II lateral collateral ligament sprain, attenuated anterior cruciate ligament, and foci of marrow

signal abnormality at the proximal tibia.  R. 371.  Finally, EMG/NCV studies performed on

December 13, 2007 showed left L5-S1 radiculopathy.  R. 396-401.

4.    *Medical Source Statement*

On October 20, 2008, Dr. William Gibbs completed a medical source statement.

R. 637-39.  Gibbs reported that Pluck could sit for only thirty consecutive minutes and would

then need to stand in place for less than fifteen minutes to obtain relief.  R. 637.  He indicated

that she could sit for less one hour in an eight-hour work day.  *Id.*  According to Gibbs, Pluck

could stand or walk about for less than fifteen minutes before she would have to alternate her

position by sitting for at least fifteen minutes.  R. 637-38.  He said that she could stand or walk

for less than a total of one hour in an eight-hour work day.  R. 638.  Gibbs wrote that in order to relieve pain, Pluck would need to be able to rest in a supine position for more time than would be afforded by a morning break, a lunch period, and an afternoon break scheduled at approximately two hour intervals.  *Id*.  He estimated that she would have to rest for six hours out of an eight-hour work day.  *Id*.

Dr. Gibbs found that Pluck could frequently lift and carry up to five pounds and could occasionally lift or carry up to ten pounds.  *Id*.  In his opinion, Pluck could rarely or never lift or carry objects weighing more than ten pounds.  R. 638-39.  Gibbs believed these restrictions to have existed and persisted at least since Pluck's alleged onset date of March 20, 1998.  R. 639.  Although no examination date is noted, Gibbs stated that his assessment was premised on his diagnoses of cervical radiculopathy, rotator cuff tear, patellofemoral syndrome and myofascial pain.  *Id*.

E.      *The Medical Experts' Testimony*

1.      *Dr. Ernest Abeles's Testimony at the October 27, 2005 Hearing*

At the October 27, 2005 hearing before ALJ Strauss, orthopedic surgeon Dr. Ernest D. Abeles testified as a medical expert.  R. 699-715.  After reviewing Pluck's medical records and listening to her testimony, Abeles concluded that Pluck had been suffering from several conditions: morbid obesity, which was treated with the gastric bypass; cervical radiculopathy with evidence of impingement and bulging discs; possible lumbar radiculopathy; and mild arthritic changes of the hips, which would explain the experience of pain in her hips. R. 704-05.  He also noted that Vicodin could have been causing the drowsiness Pluck complained of.  R. 705-06.  He explained that Vicodin is a narcotic, which means that patients taking it over a long period of time can develop both a tolerance and an addiction.  R. 706.  He

expressed criticism for the continuous long-term prescription of Vicodin, *id.*, and stated that he did not know whether patients taking Vicodin over a long period of time would become habituated to the medication such that the side effect of drowsiness might change over time, *id*.

Dr. Abeles opined that none of the impairments he had listed met the severity of a listed impairment, either alone or in combination. *Id.* He believed that the primary limitation on Pluck's ability to work was the drowsiness caused by her medication. R. 707-08. He observed that there were other pain medications she might have been prescribed, and that Pluck had not been offered any alternatives by her doctors. R. 708. Abeles also stated that he did not see the degree of drowsiness Pluck had testified to at the hearing reflected in her medical records. R. 709.

Even aside from the drowsiness, Dr. Abeles believed that Pluck's physical limitations would impede Pluck's ability to work. He thought the arthritis in her hips would make it impossible for her to perform a job that required her to stand for more than two hours a day. *Id.* He also testified that she would be unable to lift and carry more than ten pounds frequently and a maximum of twenty pounds occasionally given her history of back pain. *Id.* In Abeles's opinion, Pluck could also not sit for unlimited amounts of time; he thought she could sit for six out of eight hours, but would require an option to sit or stand as needed, especially given her bad knee and her obesity. R. 710.

2. *Dr. Arthur Brovender's Testimony at the October 21, 2008 Hearing*

Orthopedic surgeon Arthur Brovender testified as a medical expert at the October 21, 2008 hearing before ALJ Strauss. R. 644-61. He began by walking the ALJ through a selection of Pluck's medical records, at the end of which ALJ Strauss requested a summary of Pluck's impairments between March 20, 1998 and December 31, 2005. R. 646-56. Brovender

responded with a list that included sprain of the cervical and lumbosacral spine, mild carpel tunnel syndrome and tendinitis in the shoulder, a sprain in the left knee, and a questionable torn meniscus. R. 656-57. Given these impairments, Brovender estimated that Pluck could sit, with breaks, for six to eight hours in an eight-hour work day, and that she could stand or walk for four hours with breaks. R. 657. He also concluded that Pluck could lift and carry up to twenty pounds frequently and fifty pounds occasionally, that there were no limitations on her ability to lift overhead with her left arm, but that given the tendinitis in her right shoulder, she would have limited ability to lift overhead with her right arm. R. 657-58. Brovender said that Pluck could not crawl, but that she could bend, stoop and squat occasionally, and she could walk up stairs and ramps occasionally but not ropes, ladders or scaffolds. *Id.*

On examination by Pluck's attorney, Dr. Brovender acknowledged that the pain relievers and muscle relaxants Pluck was regularly prescribed can cause sleepiness, but he noted, incorrectly, that there was no place in the record where Pluck had complained of drowsiness. R. 659. ALJ Strauss then interjected to ask whether a patient will adjust to these medications over time so that she will no longer experience drowsiness. R. 660. Brovender answered that patients usually adjust. *Id.* In response, the ALJ remarked that Pluck had denied side effects of at least one narcotic pain medication. *Id.*

Pluck's attorney resumed his questioning by asking whether the MRIs taken in 2002 supported Pluck's assertions that she had been feeling pain at the time. *Id.* Dr. Brovender replied, "The MRIs do not show pain." *Id.* When pushed by counsel to answer more helpfully, Brovender testified that bulges may or may not cause pain, and that a tear of the medial meniscus and a partial tear of the supraspinatus tendon could cause pain. R. 661. Brovender assured the ALJ that he had considered the pain Pluck might be experiencing when he gave his opinion as to

23

her functional capacity, but he hedged this assurance with an observation that pain is subjective. *Id*.

F.     *The Vocational Experts' Testimony*

   1.     *Andrew Pasternak's Testimony at the March 22, 2005 Hearing*

         Andrew Pasternak testified as a vocational expert at the March 22, 2005 hearing before ALJ Kahn.  R. 804-11.  First, he classified Pluck's past relevant work experience as a nurses' aide as semi-skilled, requiring between three and six months of training, and at the medium level of physical exertion.  R. 804.  Pasternak testified that Pluck's work as a companion was less skilled, requiring only one to three months of training, and was rated at the light level of physical exertion.  R. 805.  ALJ Kahn described to Pasternak a hypothetical claimant who had Pluck's educational background and work experience and was of Pluck's age during the period for which Pluck sought benefits.  This hypothetical claimant was able to do light work, but not medium work; she could sit, stand, and walk for six hours, but she would require normal breaks during the working day and would need to be able to sit and stand as she pleased; and she could lift and carry ten pounds regularly and up to twenty pounds occasionally.  R. 806.  ALJ Kahn asked whether this hypothetical claimant could perform Pluck's past or former work.  *Id*.  Pasternak responded that she could perform the companion job.  *Id*.  He also said that such a claimant could perform other work such as that of a ticket-taker, a mail clerk, a library helper, a hand packer, a surveillance monitor, or an assembler of small products, all of which existed at the time in significant numbers in both the national and local economies.  R. 806-08.

         Pluck's attorney then asked Pasternak about a hypothetical claimant who, like the ALJ's hypothetical claimant, shared Pluck's age, educational background, and work experience but who was also hampered by the limitations Pluck had testified to: she could sit for only an

hour at a time, could stand for only half an hour, and could walk only one and a half blocks, and she would need to lie down approximately eight hours a day. R. 809. Counsel asked whether such an individual could perform any of the jobs Pasternak had mentioned, and Pasternak said she could not. *Id.*

2. *Pasternak's Testimony at the October 27, 2005 Hearing*

Pasternak again testified as a vocational expert at the October 27, 2005 hearing before ALJ Strauss. R. 715-30. He reiterated that Pluck's work as a nurses' aide was considered semi-skilled and medium work, although it might at times have qualified as heavy work, such as when she was required to lift patients. R. 718, 722. ALJ Strauss then presented to him a hypothetical claimant of Pluck's age, education, and work experience, who could stand for no more than two hours or sit for more than six hours in an eight-hour work day, who required the ability to sit or stand as needed, and who could perform work at the light exertional level, lifting and carrying 10 pounds frequently and 20 pounds occasionally. R. 723. According to Pasternak, such an individual could perform the companion job Pluck had performed for several months in 2004, which was classified as light, semi-skilled work. R. 723-26. Pasternak believed, but could not confirm, that such jobs existed in significant numbers. *Id.* The ALJ noted that at the prior hearing, Pasternak had named a number of other light, semi-skilled jobs that such a claimant could do, to which Pasternak responded, "Okay. Good." R. 726.

ALJ Strauss then asked Pasternak to consider a hypothetical claimant with the same age, education, work history, and limitations, except that this claimant also could not stand for more than one hour at a time or sit for more than a half-hour. R. 726-27. Pasternak testified that such an individual could perform the work of a ticket taker, a library helper, a surveillance system monitor, or an assembler of small products. R. 727-28. However, he acknowledged that

25

if an individual needed to "lie down all day," she could not perform any of the jobs he had identified. R. 728.

3. *Pat Green's Testimony at the October 21, 2008 Hearing*

Pat Green testified as a vocational expert at the October 21, 2008 hearing before ALJ Strauss. R. 662-671. Green also classified Pluck's past work as a nurses' assistant as semi-skilled and medium, and her work as a companion as semi-skilled and light. R. 663, 666. She too was presented with a hypothetical claimant. This claimant had Pluck's age, education, and work history, but was capable of performing work at the medium exertional level, meaning she could lift and carry fifty pounds occasionally and twenty pounds frequently; she could sit six out of eight hours each work day with normal breaks, and could walk for up to four hours with normal breaks; she could not fall or climb ladders or scaffolds, but could occasionally climb stairs and ramps; she could lift her left arm over her head without limitation but could only occasionally lift her right arm; and she had no limitation in terms of fine manipulation. R. 667. Green testified that such a claimant could perform Pluck's past work both as a nurses' aide and as a companion. *Id.*

Next, ALJ Struass asked Green to assume a claimant who shared Pluck's age, education and work experience; who could walk no more than one and a half blocks at a time, sit no more than one and a half hours at a time, and stand no more than one hour at a time; who could sit for a total of six hours in a day and stand and walk up to two hours in a day; who could lift up to twenty pounds occasionally and ten pounds frequently; and who required the ability to sit or stand as needed. R. 667-68. Green testified that such an individual could work as a ticket seller, hand packager, or assembler of small products, and that these jobs existed in significant numbers in the national and local economies. R. 668.

Pluck's counsel asked Green to consider an individual with Pluck's age, education, and work experience, who needed to lie down for approximately two-thirds of the day, and who could sit for thirty minutes, stand for fifteen to thirty minutes, and walk one to one and a half blocks. R. 689-70. Green stated that such an individual could not perform any jobs. R. 670. Counsel then began to recite the findings in Gibbs's medical source statement, *see* R. 637-39, but the ALJ cut him off, stating if Pluck's RFC was as low as Gibbs had said, "I know for myself she could not perform work that exists in significant numbers . . . so there's no need to question the vocational expert." R. 670-71.

## DISCUSSION

A.    *The Legal Standard*

Under the Social Security Act, Pluck is entitled to disability benefits if, "by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months," 42 U.S.C. § 423(d)(1)(A), she "is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy," *id*. § 423(d)(2)(A).

The Social Security Administration's regulations prescribe a five-step analysis for determining whether a claimant is disabled:

> First, the Commissioner considers whether the claimant is
> currently engaged in substantial gainful activity. If [s]he is not, the
> Commissioner next considers whether the claimant has a severe
> impairment which significantly limits [her] physical or mental
> ability to do basic work activities. If the claimant suffers such an
> impairment, the third inquiry is whether, based solely on medical
> evidence, the claimant has an impairment which is listed in
> Appendix 1 of the regulations. If the claimant has such an
> impairment, the Commissioner will consider [her] disabled without
> considering vocational factors such as age, education, and work

27

> experience; the Commissioner presumes that a claimant who is
> afflicted with a listed impairment is unable to perform substantial
> gainful activity. Assuming the claimant does not have a listed
> impairment, the fourth inquiry is whether, despite the claimant's
> severe impairment, [s]he has the residual functional capacity to
> perform [her] past work. Finally, if the claimant is unable to
> perform [her] past work, the Commissioner then determines
> whether there is other work which the claimant could perform.

*DeChirico*, 134 F.3d at 1179-80 (internal quotation marks and alterations omitted) (quoting

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982)); *see also* 20 C.F.R. § 404.1520(a)(4)(i)-(v)

(setting forth this process). The claimant bears the burden of proof in the first four steps, the

Commissioner in the last. *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003). A

claimant who is working for substantial earnings is generally considered to be able to do

substantial gainful activity and therefore not disabled under step one of this analysis. 20 C.F.R. §

404.1574 (a)(1).

The Commissioner decides whether the claimant is disabled within the meaning of

the Act. 20 C.F.R. § 404.1527(e)(1). Under 42 U.S.C. § 405(g), I review the Commissioner's

decision to determine whether the correct legal standards were applied, and whether the decision

is supported by substantial evidence. *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987). If

the record contains evidence which "a reasonable mind might accept as adequate to support [the

Commissioner's] conclusion," this Court may not "substitute its own judgment for that of the

[Commissioner] even if it might justifiably have reached a different result upon a *de novo*

review." *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991) (quotation marks omitted).

B.      *ALJ Strauss's December 2, 2008 Decision*

In a decision dated December 2, 2008, ALJ Strauss denied Pluck's claim for

benefits under Title II of the Social Security Act. R. 20-29. ALJ Strauss determined that Pluck's

last date insured was December 31, 2005,[11] R. 22, and that Pluck did not experience a period of disability within the meaning of the act between March 20, 1998, the alleged onset date, and December 31, 2005, the last date insured. R. 21. The ALJ arrived at this determination by applying the five-step procedure outlined above. First, the ALJ found that Pluck had engaged in substantial gainful activity for a portion of the period of alleged disability; she had worked for seven months in 2004, earning $10,367.65, or an average of $1481.09 per month, and an individual is generally considered to have engaged in substantial gainful activity of her monthly earnings averaged more than $810.00 in 2004.[12] R. 22-23 (citing 20 C.F.R. § 404.1574, et al.). The ALJ determined that Pluck's work in 2003 and 2004 could not be considered an unsuccessful work attempt, as she worked for more than six months. R. 23 (citing 20 C.F.R. § 404.1574(c)).

Second, ALJ Strauss determined that Pluck suffered from several severe impairments through the date last insured: cervical disc disease, lumbar disc disease, tendonitis in her right shoulder, a sprain in her left knee, and a questionable tear of the medial meniscus. R. 23. She found these impairments to be severe as they significantly limited Pluck's ability to perform basic work activities. *Id.* Under the third step of the analysis, the ALJ found that Pluck's impairments did not meet or medically equal one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix I. R. 23 (citing 20 C.F.R. §§ 404.1525, 404.1526). She therefore moved to the fourth step of the analysis and determined that Pluck had the RFC, through the date

---

[11] A claimant is eligible to receive disability insurance benefits only if she is "insured for disability insurance benefits." 42 U.S.C. §§ 423(a)(1)(A), 423(c)(1). Pursuant to Sections 223(c)(1), 202(a), and 213 of the Social Security Act, a claimant is insured under Title II of the Social Security Act if she has earned income for a total of ten years, and for a total of five years within the last ten years. The last date on which a claimant is insured under Title II is known as her "date last insured." A claimant is entitled to benefits only if she became disabled prior to her date last insured. *See Arnone v. Bowen*, 882 F.2d 34, 38 (2d Cir. 1989).

[12] Although Pluck was indeed engaged in substantial gainful activities for several months in 2003 and 2004, as the Commissioner acknowledges, the ALJ's analysis on this point was not accurate. See *infra* note 10 for an accurate calculation.

last insured, to perform medium work, which involves lifting or carrying fifty pounds occasionally and twenty pounds frequently, sitting six hours and standing or walking four hours out of an eight-hour work day with normal breaks. R. 23. She found that Pluck could not crawl or climb ropes, ladders or scaffolds, but could occasionally climb stairs and ramps, bend, stoop or squat and perform overhead lifting with her right arm. *Id.* Finally, the ALJ found that Pluck had no limitations using her left arm, no manipulative limitations or push/pull limitations with her left extremities and no environmental limitations. *Id.*

In arriving at these determinations, ALJ Strauss considered Pluck's testimony as well as her medical records, which she summarized in her written opinion. R. 23-25. ALJ Strauss also reviewed the testimony of Dr. Brovender, which she accepted "due to his expertise in the field of medicine and its consistency with the clinical, objective and diagnostic evidence of record and because he reviewed the entire medical record." R. 26. The ALJ also noted that she had not considered or relied on the testimony Dr. Abeles had given as a medical expert at the October 27, 2005 hearing because Abeles had subsequently stipulated that he could no longer testify at hearings.[13] R. 27.

ALJ Strauss explained that she did not find Pluck's testimony concerning the intensity, persistence and limiting effects of her symptoms credible to the extent the testimony was inconsistent with Dr. Brovender's RFC assessment. R 26. The ALJ further pointed to internal inconsistencies in Pluck's testimony. *Id.* She noted that Dr. Sohal, a treating physician, had declared Pluck totally disabled, but observed that "he did not submit any objective or clinical evidence to support this opinion," and she therefore refused to rely on this opinion concerning a question that, she noted, is reserved to the Commissioner. *Id.* (citing SSR 96-5p (specifying that whether an individual is disabled under the Social Security Act is not a medical issue, but one

---

[13]     The issues that gave rise to this stipulation are discussed below.

reserved to the Commissioner)).  ALJ Strauss also discredited Dr. Gibbs's medical source statement, as she found the limitations specified by Gibbs inconsistent with Pluck's daily activities.

Based on her RFC determination, ALJ Strauss concluded that Pluck was capable of performing her past relevant work as a nurses' assistant during the period at issue.  R. 27.  In arriving at this conclusion, the ALJ relied on vocational expert Green's testimony that work as a nurses' assistant requires medium exertion, and that an individual with Pluck's age, education, work experience, and physical limitations as found by ALJ Strauss could work either as a nurses' assistant or as a companion, which requires only light exertion.  *Id.*  Although she found Pluck not disabled under step four of the analysis, ALJ Strauss moved on to step five and assumed, in the alternative, that Pluck was capable of performing only light work, not medium work as she had found.  She noted that Green had identified a number of jobs – ticket seller, hand packager, and assembler of small products – that could be performed by an individual who shared Pluck's age, education and work experience, and who was limited to performing light work, lifting no more than twenty pounds occasionally and ten pounds frequently, sitting no more than six hours and standing or walking no more than two hours in a work day, and requiring an option to sit or stand at will.  *Id.*  Accordingly, ALJ Strauss determined that even if Pluck were not able to perform her past relevant work, she would be able to perform other jobs existing in significant numbers, and that she therefore was not disabled within the meaning of the Social Security Act.  R. 28.

C.      *Pluck's Objections to the Commissioner's Decision*

Pluck raises multiple objections to the Commissioner's decision, which was based on ALJ Strauss's December 2, 2008 decision denying Pluck's application for benefits.  She

argues that the ALJ erred by (1) failing to consider Dr. Abeles's October 27, 2005 testimony; (2) relying on Brovender's testimony to make her RFC determination; (3) failing to develop the record; (4) improperly evaluating the evidence supplied by Pluck's treating physicians; and (5) improperly assessing Pluck's credibility.

D.    *Analysis of the ALJ's Decision*

      1.    *The Disregard of Evidence Indicating Drowsiness as a Limitation on Pluck's Ability to Work*

      On her application for benefits, Pluck wrote that she could not work, in part because her pain required her to take medication that made her drowsy.  R. 147.  She testified at multiple hearings that her pain medication made it difficult for her to function, R. 683, 684, 690, 749, and she claimed she lost her job because she was found sleeping while on duty, having fallen asleep under the influence of her medication.  R. 683.  The ALJ entirely discounted Pluck's claims of drowsiness.

      In determining whether a claimant is disabled, the Commissioner must consider the claimant's subjective accounts of pain and disability but "may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence on the record." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010).  The regulations set forth a two-step process for evaluating a claimant's assertions of pain and disability:

> At the first step, the ALJ must decide whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged. . . . If the claimant does suffer from such an impairment, at the second step, the ALJ must consider the extent to which the claimant's symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence of record.  The ALJ must consider statements the claimant or others make about his impairments, his restrictions, his daily activities, his efforts to work, or any other relevant statements he makes to medical sources during the course of examination or treatment, or to the agency during interviews, on

applications, in letters, and in testimony in its administrative proceedings.

*Id.*, 606 F.3d at 49 (quotation marks and alterations omitted) (citing 20 C.F.R. §§ 404.1529(a), 404.1512(b)(3); S.S.R. 96-7p). In assessing Pluck's assertions that she was too drowsy to work throughout the alleged period of disability, the ALJ failed to apply this analysis.

The ALJ cited Dr. Brovender's statements that Pluck's impairments could cause pain, and that her pain medications could cause drowsiness, R. 26, but she gave no weight to Pluck's testimony that the soporific effects of the medication she used to ease her pain limited her ability to work. The ALJ properly looked to the evidence on the record to determine whether it was consistent with Pluck's testimony, but she incorrectly sifted through that evidence and referenced only those items that contradicted Pluck's account. For instance, the ALJ pointed to notations by Sohal on July 25, 2001 and December 3, 2001 that Pluck was tolerating her medication and denied any side effects, R. 26; *see also* R. 305, 307, but she did not mention the multiple occasions in April 1998 and 1999 on which Dr. Sohal noted that Pluck's medication made her too drowsy to function, *see* R. 276-77, 293. The ALJ also relied on the testimony of Brovender, who incorrectly stated that there was no place in the record where Pluck had complained of drowsiness. R. 659.

"While the ALJ is not obligated to 'reconcile explicitly every conflicting shred of medical testimony,' [s]he cannot simply selectively choose evidence in the record that supports [her] conclusions." *Gecevic v. Secretary of Health and Human Services*, 882 F.Supp. 278, 286 (E.D.N.Y. 1995) (quoting *Fiorella v. Heckler*, 725 F.2d 174, 176 (2d Cir. 1983)) (citations omitted). Where a report from a medical source "contains a conflict or ambiguity that must be resolved," the ALJ is required to "seek additional evidence or clarification" from the source. 20 C.F.R. § 404.1512(e)(1). Given the ALJ's duty to consider Pluck's account of her limitations

against the background of the full record, and her obligation to develop that record where necessary, the ALJ's selective reading of the evidence was improper. *See Correale-Englehart*, 687 F.Supp.2d 396, 439 ("In short, the ALJ cherry-picked some of the findings of the [doctor] – notably those that minimized plaintiff's . . . limitations – and ignored others. This was of course improper."); *Fuller v. Astrue*, No. 09-CV-6279, 2010 WL 5072112, at *6 (W.D.N.Y. Dec. 6, 2010) ("Essentially, the ALJ cherry-picked several opinions that were supportive of her decision and disregarded the majority of the medical evidence in the record including that of the treating physicians. This type of selective analysis of the record is improper."). On remand, the ALJ must assess Pluck's claims of drowsiness according to the rubric established by the regulations and after a full development and examination of the record.

   2.   *The Assumption that Pluck's Limitations Were Constant Throughout the Alleged Period of Disability*

        In discrediting Pluck's description of her medication's side effects, the ALJ also pointed to what she perceived as inconsistencies in Pluck's testimony. In particular, she disbelieved Pluck's testimony that she had to lie down sixty percent of the time while employed as a companion,[14] and she concluded that, because Pluck was able to work for periods in 2003 and 2004, she could not have been so limited by her pain and the side-effects of her medication at any time during the alleged period of disability that she could not work. R. 26.

        As the ALJ concluded, Pluck was not disabled within the meaning of the Act during a period of substantial gainful activity that occurred during in 2003 and 2004.[15] However,

---

[14]     The ALJ mischaracterized Pluck's testimony about lying down on the job. While Pluck stated that she had to "lie down" sixty percent of the time, R. 682-83, the ALJ found incredible that Pluck "slept" sixty percent of the time, R. 26. The ALJ also made no mention of the circumstances under which Pluck lost her companion job after only three months.

[15]     Pluck was continuously employed for a nine-month period between August 2003 and April 2004. R. 162, 678. Between August 2003 and December 2003, Pluck earned $4,055.30, R. 142, or an average of $811.07 per month. Between January 2004 and April 2004, she earned $5082.70, or an average of $1270.68 per month. Her monthly income throughout the nine-month period therefore exceeded the threshold earnings amounts for 2003

Pluck has claimed benefits for a period beginning approximately thirteen years ago. The medical records, as well as Pluck's own testimony, suggest that the severity of Pluck's condition has varied over that extensive period of time. In particular, Pluck suffered two accidents, one in 1998 and one in 2002, and her testimony suggests that her suffering may have been particularly acute in the time periods following these accidents and may have gotten worse since she stopped working in 2004.

In addition, the record shows that Pluck engaged in a regular course of physical therapy beginning in March 2002 and ending just prior to her period of substantial gainful activity, and it contains evidence that Pluck's condition might have improved as a result of the physical therapy, enabling her to work for at least a brief period of time. The ALJ erred in assuming that Pluck's physical condition remained unchanged throughout the alleged period of disability. By extrapolating from Pluck's spell of substantial gainful activity in 2003 and 2004 that she was not disabled at any time after 1998, the ALJ effectively penalized Pluck for returning to work when she was able. *See Montes-Ruiz v. Chater*, 129 F.3d 114 (2d Cir. 1997) (unpublished opinion) (a claimant "should not be penalized for trying to work and manage without benefits").

The ALJ also emphasized trips that Pluck took to Florida in 2004 and Guyana in 2005, as well as her practice of driving her children to school. R. 26. She did not mention Pluck's testimony that she was unable to drive for a period of time after her 1998 accident, R. 686-87, 690, or her testimony that even during the period when she was able to drive, she was

---

($800 per month) and for 2004 ($810 per month) that ordinarily show a claimant has been engaged in substantial gainful activity. *See* 20 C.F.R. § 404.1574(b)(2); http:/www.socialsecurity.gov/OACT/COLA/sga.html. Pluck also worked for three months between October and August 2004. R. 162, 681-82. Because this period lasted for less than six months, and because Pluck testified that she stopped working because of her impairments, this second period can be considered an "unsuccessful work attempt," which does not show Pluck was able to engage in substantial gainful activity. 20 C.F.R. § 404.1574(c).

doing her best to "function like a person should," but required assistance with her household chores and spent most of her day lying down. R. 790-91, 794-96. Pluck's testimony as to her limitations may not have been credible, but before the ALJ could properly arrive at that conclusion, she was required to consider a full range of factors, including the medical records and the entirety of Pluck's testimony. *See* 20 C.F.R. § 404.1529(c), 416929(c).

The ALJ erred in using isolated events and certain details about the activities that Pluck has performed since 1998 as the sole basis for discrediting her account of the limitations she suffers. "When a disabled person gamely chooses to endure pain in order to pursue important goals, it would be a shame to hold this endurance against him in determining benefits unless his conduct truly showed that he is capable of working." *Nelson v. Bowen*, 882 F.2d 45, 49 (2d Cir. 1989)). On remand, the ALJ must sufficiently examine and develop the record to appropriately assess Pluck's credibility and to determine whether, at any point during the period of alleged disability, Pluck's injuries required her to choose between debilitating pain and debilitating medication or otherwise prevented her from working.

3.    *The Disregard of Dr. Sohal's Opinion that Pluck Was Unable to Work*

Under the treating physician rule set out in 20 C.F.R. § 404.1527(d), a treating physician's opinion about the nature and severity of a claimant's impairments is entitled to "controlling weight" if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2); *see also Schisler v. Sullivan*, 3 F.3d 536, 568 (2d Cir. 1993) (upholding regulations). The Commissioner must set forth "good reasons" for refusing to accord the opinions of a treating physician controlling weight. *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999). He must also give "good reasons" for the weight actually given to those opinions

if they are not considered controlling. 20 C.F.R. § 404.1527(d)(2); *see also Halloran v. Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004) ("We do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician[']s opinion and we will continue remanding when we encounter opinions from ALJs that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion."); *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999) ("Under the applicable regulations, the Social Security Administration is required to explain the weight it gives to the opinions of a treating physician.").  If it is not given controlling weight, the weight given to a treating physician's opinion must be determined by reference to: "(i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other relevant factors."  *Schall v. Apfel*, 134 F.3d 496, 503 (2d Cir. 1998) (citing 20 C.F.R. § 416.927(d)(2)).

During the period of alleged disability, Pluck was seen by two treating physicians, Drs. Sohal and Fazzini.  Pluck was treated by Sohal more than two dozen times over the course of four years, and she was subsequently treated by Fazzini over a dozen times in two or three years, including approximately monthly visits during a ten-month period.  ALJ Strauss ignored, gave no weight to, or failed to develop certain opinions issued by these physicians.

In particular, Dr. Sohal regularly opined that Pluck was totally disabled.  Twice in April 1998 and again in November 1998, he wrote letters stating that Pluck was totally disabled and unable to work due to severe pain from her injuries. R. 275-77.   In the April letters, Sohal also wrote that drowsiness induced by Pluck's medicine rendered her unable to function.  R. 276-77.  Regularly throughout 1998 and 2001, Sohal noted that Pluck was "totally disabled" or

"partially totally disabled," R. 279-81, 283-86, 302-04, 321, and in March 1999, he deemed it "difficult to assess patient's return to work," R. 288. ALJ Strauss disregarded Sohal's reports of disability because "he did not submit any objective or clinical evidence to support this opinion," and because the question of whether a claimant is unable to work is reserved to the Commissioner and "[t]reating source opinions on issues reserved to the Commissioner are never entitled to controlling weight or even special significance." R. 26.

   As the ALJ observed, a treating physician's determination that a claimant is "disabled" or "unable to work" is not controlling and does not mean that the claimant is entitled to benefits. 20 C.F.R. § 404.1527(e). "Nevertheless, an ALJ must review 'all of the medical findings and other evidence that support a medical source's statement that [a claimant] is disabled.'" *Peralta v. Barnhart*, No. 04-CV-4557 (JG), 2005 WL 1527669, at *10 (June 22, 2005) (quoting 20 C.F.R. § 404.1527(e)(1)) (brackets in original). Furthermore, even where an issue is reserved to the Commissioner, a treating source's opinion "must never be ignored" and must be "carefully consider[ed]." SSR 96-5p. This does not mean that the ALJ must accept the treating physician's opinion "at face value," but in assessing the opinion, the ALJ must "inquire into the bases for the opinion and whatever other information he needs" to make an assessment. *Pena v. Astrue*, No. 10-CV-0986 (FB), 2010 WL 321741, at *4 (E.D.N.Y. Jan. 31, 2011). "[I]f the evidence does not support a treating source's opinion on any issue reserved to the Commissioner and the adjudicator cannot ascertain the basis of the opinion from the case record, the adjudicator must make 'every reasonable effort' to recontact the source for clarification of the reasons for the opinion." Soc. Sec. Ruling 96-5p, 1996 WL 374183, at *6 (S.S.A. July 2, 1996).

The ALJ made no effort to contact Dr. Sohal or otherwise determine the bases for his repeatedly expressed opinion that Pluck was unable to work. Sohal diagnosed Pluck with conditions including chronic right shoulder derangement, adhesive capsulitis, cervical derangement, and cervical radiculopathy, *e.g.*, R.288, 290, 293 – findings that were supported by MRIs and CT scans performed in the summer of 1998, R. 309-11; *see also* R. 24 (ALJ discussing MRI results). In deciding to give no weight to Sohal's opinion, the ALJ considered only one of the reasons that the regulations require her to consider – the evidence in support of the opinion. *See* 20 C.F.R. § 416.927(d)(2). Even then, she stated only that Sohal "did not submit any objective or clinical evidence to support this opinion." R. 26. The ALJ ignored the evidence on the record that supports Sohal's opinion and disregarded her obligations to make "every reasonable effort" to understand the bases of his opinion, *see* SSR 96-5p, and to supplement the record, *see* § 404.1512(e)(1) (ALJ must "seek additional evidence or clarification from [claimant's] medical source when the report from [the] medical source . . . does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques."); *Rosa v. Callahan*, 168 F.3d 72, 80 (2d Cir. 1999) ("[A] treating physician's 'failure to include this type of support for the findings in his report does not mean that such support does not exist . . . .'" (quoting *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998)). The ALJ's insufficiently explained disregard of Sohal's opinion and her failure to explore the bases of his opinion were erroneous.

3.     *The Failure to Clarify Dr. Fazzini's Opinion the Pluck Was "Partially Disabled"*

In rejecting Dr. Sohal's opinion that Pluck was totally disabled, the ALJ relied in part on Dr. Fazinni's opinion that Pluck was "partially disabled." R. 26. Fazinni deemed Pluck "partially disabled" consistently between 2002 and 2004, but he did not explain what he meant

by the term. On March 22, 2002, Fazinni wrote both that Pluck was "partially disabled" and that she should refrain from "*any* physical activity including lifting, bending and twisting." R. 225-26. Eight months later, on November 22, 2002, Fazinni wrote that Pluck was "partially disabled" but capable of "[l]ifting, bending and twisting with caution." R. 248-49. Apparently, Fazinni's use of the term changed over the more than two-year period Pluck was his patient and, at least at times, he appears to have meant it in a much more restrictive manner than it was construed by the ALJ, who read "partially disabled" to mean "able to work," *see* R. 26.

The ALJ was under an obligation to clarify this apparent inconsistency in Fazinni's use of the term "partially disabled." *See McGowan v. Astrue*, No. 07-CV-2252 (DLI) (SMG), 2009 WL 792083, at *10 (Mar. 23, 2009) ("[T]he Second Circuit has vacated and remanded when the ALJ failed 'to seek out clarifying information concerning the perceived inconsistencies between [the treating physician's] two reports'" (quoting *Clark*, 143 F.3d at 118 (brackets in original))). Her use of Fazinni's phrase to bolster her conclusions without any attempt to clarify what the doctor actually meant was in error. The ALJ was under an obligation either to determine the meaning of the phrase based on Fazinni's extensive clinical findings or to supplement the record pursuant to 20 C.F.R. §§ 404.1512(d) and (e).

Indeed, the ALJ seems to have ignored portions of Dr. Fazinni's voluminous reports. For example, while she found "no quantitative evidence of any significant motor loss with muscle weakness" in Pluck's records, Fazinni over and over again found "[s]ignificant . . . weakness" in the left grip, deltoid, and bilateral soleus muscles. *E.g.*, R. 235, 238, 241, 244, 247. Rather than ignore those observations that did not square with her conclusions, the ALJ was required to examine the record to understand and evaluate the treating physicians' opinions and, if the record contained insufficient evidence, to "pursue relevant, and possibly crucial,

information from her treating sources that was absent from their submissions but necessary to assess their findings," *Correale-Englehart v. Astrue*, 687 F. Supp.2d 396, 431 (S.D.N.Y. 2010).

4.      *The Unreasoned Adoption of Dr. Brovender's Residual Functional Capacity Determination*

"In determining the claimant's physical ability, or residual work capacity, the [ALJ] must consider objective medical facts, diagnoses and medical opinions based on such facts, and subjective evidence of pain or disability testified to by the claimant or others." *Ferraris v. Heckler*, 728 F.2d 582, 585 (2d Cir. 1984); *see also* 20 C.F.R. §§ 404.1545, 416.945. The ALJ must also "give considerable – and if uncontradicted, conclusive – weight to the expert opinions of the claimant's own treating physicians." *Ferraris*, 728 F.2d at 585. As discussed above, the ALJ improperly disregarded the opinions of Pluck's treating physicians and improperly discredited Pluck's own testimony in determining the nature and extent of Pluck's disabilities. Instead, the ALJ simply adopted the RFC determination of Dr. Brovender, who testified at the October 21, 2008 hearing as a medical expert.

Dr. Brovender reluctantly acknowledged that the conditions revealed in the 2002 MRIs could cause pain, R. 661, but he disagreed with Dr. Sohal's determination that Pluck was unable to work, testifying that Pluck could perform medium level work, R. 657-58. Brovender did not provide any reasoning to support his conclusions, but the ALJ nonetheless adopted them at face value. R. 23, 26. The ALJ attributed her acceptance of Brovender's opinion to "his expertise in the field of medicine and its consistency with the clinical, objective and diagnostic evidence of record and because he reviewed the entire medical record." R. 26. However, as discussed above, the ALJ did not appropriately explain why she dismissed so many of Sohal's and Fazinni's observations, nor did she explain how a finding that Pluck could lift up to 50 pounds occasionally and 20 pounds frequently, R. 23, throughout her entire period of disability

was consistent with Pluck's constant need for pain medication and physical therapy since her 1998 accident. The ALJ erred in her complete acceptance of Brovender's RFC determination at the expense of so many observations in the records of Pluck's treating physicians, which went unexplained or unacknowledged in her decision. *See Falco v. Astrue*, No. CV-07-1432 (FB), 2008 WL 4164109, at *6 (E.D.N.Y. Spet. 5, 2008) ("The ALJ erred in failing to articulate, under the rubric of the regulations, why he credited another doctor's opinion that [claimant] could perform a full range of sedentary work over the opinions of treating physicians[.]"). On remand, after a full development of the record, the ALJ must cite the medical and testimonial evidence that supports her RFC determination.

5.      *The Disregard of Dr. Abeles's Testimony*

In discrediting Pluck's claims of drowsiness, the ALJ disregarded the testimony of Dr. Abeles, who testified as a medical expert at the October 27, 2005 hearing that Pluck's "medication imposes a great deal of difficulty in terms of working," and that he did not think Pluck "could function successfully in doing any reasonable job for periods of time because of the limitations of the narcotic, the Vicodin." R. 707-08. Abeles also thought "the fact that the medication does cause the drowsiness certainly prevented her from working effectively [in 2003 and 2004] and I believe her story that this led to her firing." R. 707. The ALJ did not consider or rely on any part of Abeles's testimony because, she explained, he "has stipulated that he can no longer testify at hearings." R. 27. Pluck argues that the ALJ's complete disregard of Abeles's testimony was erroneous.

According to public records,[16] after he testified at Pluck's 2005 hearing, Abeles was charged with three counts of practicing medicine with gross negligence, one count each of practicing medicine with negligence and with incompetence, and three counts of failure to maintain records.  Some of the allegations of malfeasance date back to as early as 1996.  Abeles did not contest the charges and, effective July 21, 2006, he agreed to a consent order that "preclude[d] patient contact and any practice of medicine, clinical or otherwise, and . . . precluded [him] from diagnosing, treating, operating, or prescribing for any human disease, pain, injury, deformity, or physical condition, with the sole exception that [he might] continue in [his] practice of conducting independent medical examinations for the Social Security Administration and for insurance carriers."

Subsequently, Dr. Abeles's authorization to treat workers' compensation claimants and to conduct independent medical examinations of workers' compensation claimants was temporarily suspended, effective October 25, 2006, and it was permanently revoked effective January 18, 2008.  *See* New York State Workers' Compensation Board, Subject No. 046-222, Permanent Revocation/Voluntary Registration of Doctors' Authorizations to Treat Workers' Compensation Claimants and/or Conduct Independent Medical Examinations (IME), February 5, 2008, http://www.wcb.state.ny.us/content/main/SubjectNos/sn046_222.jsp.  Finally, effective November 25, 2009, the 2006 consent order was modified to stipulate that Abeles would "never practice medicine in New York state as a physician or activate his registration to practice medicine as a physician in New York state."

Pluck argues that, despite these limitations on Dr. Abeles's ability to practice, at the time of ALJ Strauss's December 2, 2008 decision, he had not agreed to, nor was he required

_____

[16]     All public documents referenced here, including the consent orders limiting Abeles's ability to practice medicine, are available at the New York State Department of Health, Office of Professional Medical Conduct, http://w3.health.state.ny.us/opmc/factions.nsf.

to, cease testifying at hearings before the Social Security Administration. Pl.'s Mem. 8-9, Dec.

20, 2010, ECF No. 21. Whether or not Abeles specifically agreed not to testify before Social

Security adjudicators, the uncontested charges of grossly negligent conduct and the restrictions

placed on his practice cast substantial doubt on the reliability of his testimony. The ALJ on

remand will be justified in rejecting his testimony in his entirety. While the ALJ may not be

barred from considering Abeles's testimony,[17] as she implied she was in her 2008 decision, both

courts and the Commissioner have recognized that Abeles's record may undermine the reliability

of his testimony. *See Maline v. Astrue*, 08-CV-1712 (NGG) (CP), 2010 WL 4258259, at *1 n.1

(E.D.N.Y. Oct. 21, 2010) (noting that the Commissioner "recognize[d] that the imposition of

restrictions on Dr. Abeles may cast doubt on the reliability of his testimony" and explained that

on remand, "the ALJ will obtain new testimony from a medical expert"); *Forbes ex rel. Forbes v.

Astrue*, No. 08-CV-1991 (NGG), 2010 WL 1529273, at *3 n.1 (E.D.N.Y. Apr. 15, 2010) ("The

ALJ should also consider the weight that should be afforded to the testimony of Dr. Abeles in

light of the disciplinary actions against him." (citing *Burgess v. Astrue*, 537 F.3d 117, 125 (2d

Cir. 2008) (noting that disciplinary action had been taken against Abeles))); *Gross v. Astrue*, No.

08-CV-578 (NG), 2010 WL 301945, at *3 (E.D.N.Y. Jan. 15, 2010) (noting that the

Commissioner had conceded that Abeles's testimony "may no longer be considered 'reliable'" in

light of the consent order against him). Accordingly, on remand, the ALJ may properly decide to

give no weight to Abeles's testimony.

---

[17] *See* 20 C.F.R. § 404.1503a ("We will not use in our program any individual or entity, *except to provide existing medical evidence . . .* whose license to provide health care services is currently revoked or suspended by any State licensing authority pursuant to adequate due process procedures for reasons bearing on professional competence, professional conduct, or financial integrity . . . ." (emphasis added)).

CONCLUSION

For the reasons stated above, the Commissioner's motion for judgment on the pleadings is denied and Pluck's motion is granted, but only to the extent that the case is remanded to the Commission for further proceedings consistent with this decision.

So ordered.

John Gleeson, U.S.D.J.

Dated: March 9, 2011
      Brooklyn, New York